1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   JOHN J. LULEJIAN (Cal. State Bar No. 186783)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-8603
7       Facsimile: (213) 894-3713
        E-mail:  John.Lulejian@usdoj.gov
8
   Attorney for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        ) Case No. MJ 10-2634
                                     )
13                 Plaintiff,        ) GOVERNMENT'S MEMORANDUM IN
                                     ) SUPPORT OF MOTION FOR DETENTION
14            v.                     )
                                     ) Date:      October 22, 2010
15  FREDERICK DARREN BERG,           ) Time:      1:30 p.m.
                                     ) Location:  Duty Magistrate
16                 Defendant.        )            Courtroom
                                     )
17                                   )

18       Plaintiff United States of America, by and through its

19  counsel of record, the United States Attorney for the Central

20  District of California, hereby submits the attached Memorandum of

21  in Support of Motion for Detention, filed on this day, in the

22  United States District Court for the Western District of

23  \\

24  \\

25  \\

26  \\

27  \\

28

1  Washington, in <u>United States v. Frederick Darren Berg</u>, WDWA Case
2  No. MJ 10-422.

3
   Dated:    <u>October 22, 2010</u>          Respectfully submitted,
4                                             ANDRÉ BIROTTE JR.
                                              United States Attorney
5
                                              ROBERT E. DUGDALE
6                                             Assistant United States Attorney
                                              Chief, Criminal Division
7

8  _____
9                                             JOHN J. LULEJIAN
                                              Assistant United States Attorney
10
                                              Attorneys for Plaintiff
11                                            United States of America

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                   2

Magistrate Judge Brian A. Tsuchida

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UNITED STATES OF AMERICA,  )
                             )
                Plaintiff,   )     NO. MJ10-442
                             )
        v.                   )     MEMORANDUM IN SUPPORT OF
                             )     MOTION FOR DETENTION
FREDERICK DARREN BERG,       )
                             )
                Defendant.   )
                             )

## I.    Introduction

The United States has moved for an order of pretrial detention of defendant, Frederick Darren Berg, based on Mr. Berg's serious risk of flight and serious risk that he will obstruct justice. Mr. Berg is charged with a massive wire fraud scheme involving losses of well over $100 million, as well as one count of Money Laundering and one count of Bankruptcy Fraud. The government believes he is a serious risk of flight based on the fact that he has admitted that he consulted with an attorney in an effort to establish an offshore trust in the Central American country of Belieze for the purpose of fleeing prosecution, but lied to the government and claimed he had never established this trust. The government has now discovered that Mr. Berg placed hundreds of thousands of dollars into an account in the name of this trust and then lied again when confronted by the Chapter 11 bankruptcy trustee about the source of these funds. Moreover, the government has evidence that Mr. Berg sought to reinstate his offshore trust in Belieze as recently as June 30, 2010.

Memorandum in Support of Motion for Detention Hearing/- 1
Frederick Darren Berg, No. MJ10-442

1        The government also believes Mr. Berg is a serious risk to obstruct justice based

2 on that fact that Mr. Berg has actively sought to obstruct justice during the investigation

3 of his crimes by making false statements to the FBI, making false statements to the

4 Chapter 11 bankruptcy trustee, and through the submission of false documents to the

5 Chapter 11 bankruptcy trustee and the Federal Bankruptcy Court. Indeed, Mr. Berg has

6 actively tried to conceal the source and nature of hundreds of thousands of dollars from

7 the Federal Bankruptcy Court and Chapter 11 bankruptcy trustee in a personal bankruptcy

8 case that is closely related to his criminal conduct. Because the very essence of the

9 bankruptcy fraud charge in the pending complaint involves obstruction of justice and

10 false statements submitted to a Federal Court, he has already shown that he is a serious

11 risk to obstruct justice.

12        Mr. Berg has demonstrated that he simply cannot be trusted under any

13 circumstances, as he has been lying to Federal agents, lying to the Federal Bankruptcy

14 Court and lying to the Chapter 11 bankruptcy trustee, all while attempting to portray

15 himself as a cooperative, forthright, defendant deserving of pretrial release and the court's

16 trust. Because Defendant cannot be trusted to comply with any conditions of release and

17 because he represents a significant risk of flight as well as a serious risk to obstruct

18 justice, the Court should order pretrial detention.

19 **II.    Factual Background**

20        The investigation that led to Mr. Berg's arrest started around July 16, 2010, when

21 an attorney representing Mr. Berg approached the government and indicated Mr. Berg

22 had committed a fraud and wished to provide a full accounting of his activity and

23 cooperate with the government. Mr. Berg's counsel stated that Mr. Berg wished to accept

24 responsibility and come in "palms up." Since that time, Mr. Berg's cooperation has been

25 inconsistent and manipulative. He has provided extensive incriminating information

26 about much of his criminal behavior while at the same time omitting significant material

27 facts and outright lying about substantial assets still under his control. Thus his behavior

28

Memorandum in Support of Motion for Detention Hearing/- 2
Frederick Darren Berg, No. MJ10-442

1 | has led to a false appearance of cooperation while preserving his access to resources that

2 | could support his flight from prosecution.

3 |       Between January 2001, and August 2010, Mr. Berg created and operated a series

4 | of investment funds purportedly for the purpose of investing in seller financed real estate

5 | contracts, hard money loans, real estate and mortgage backed securities. These funds

6 | were known as: Meridian Mortgage Investors Funds 1, 2, 3, 5, 6, 7, 8, 9, and 10 (the

7 | mortgage investment funds); Meridian Real Estate Opportunity Funds 1 and 2 (the real

8 | estate investment funds); and CS Note Holdco (the mortgage backed security investment

9 | fund).

10 |       The mortgage investment funds were purportedly established to primarily invest in

11 | the purchase of seller financed real estate contracts and to fund short term loans backed

12 | by mortgages on real property. Payments to investors in the mortgage investment funds

13 | were purportedly to be made from the cash flows generated by borrower payments. Over

14 | the past ten years, Mr. Berg raised approximately $350 million from approximately 1,000

15 | investors in the mortgage investment funds. Instead of spending the money as promised,

16 | however, Mr. Berg began stealing from the funds and using the investors' money for his

17 | other business interests and personal expenses. In order to continue the scheme, Mr. Berg

18 | began using new investor's money to cover interest and principal payments to older

19 | investors in a classic Ponzi scheme.

20 |       In 2009, a large investor in the mortgage funds requested a redemption of their

21 | investment that Mr. Berg was unable to cover because of his thefts from the funds. In

22 | order to cover this redemption request and continue the scheme, Mr. Berg began creating

23 | new funds including two new mortgage investment funds, two funds that would

24 | purportedly invest in real estate, and an investment company that would purportedly

25 | purchase the large investor's notes at a discount. These funds, however, were in fact set

26 | up merely to continue the Ponzi scheme. Between March 2009, and August 2010,

27 | Mr. Berg managed to raise $16 million in what he described as a "survival mode" attempt

28 | to salvage the scheme.

Memorandum in Support of Motion for Detention Hearing/- 3
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Despite his efforts to roll the Ponzi scheme into new investment funds, by June 15, 2010, Mr. Berg was unable to keep up with the monthly interest payments. Mr. Berg then spent several weeks avoiding investors and telling a variety of lies to the investors to cover his scheme. On July 9, 2010, the investors in Funds 2, 5, 7, and 8 initiated actions to force the funds into involuntary Chapter 11 bankruptcy. *See In Re: Meridian Mortgage Investors Funds II-X*, Case Number 10-17952 (Bankr. W.D. Wash.). On July 20, 2010, the Bankruptcy Court appointed Mark Calvert of Cascade Capital as the Chapter 11 Trustee for the funds. On August 4, 2010, Funds 6, 9, and 10 were added to the bankruptcy proceedings, and on August 16, 2010, Mr. Berg agreed to place Real Estate Opportunity Funds 1 and 2 into the bankruptcy proceedings. As trustee for the Meridian Funds bankruptcy, Mr. Calvert controls all of the investment funds placed into the bankruptcy proceeding.

On July 22, 2010, FBI agents met with Mr. Berg, his attorney, and bankruptcy trustee Mark Calvert at the Meridian office space on Fourth Avenue in Seattle, Washington. At that meeting, Mr. Berg stated that he was going to be helpful and that he knew he was going to jail. Mr. Berg's attorney, however, indicated that a full debriefing with Mr. Berg would have to wait until the bankruptcy proceedings settled down. During this meeting Mr. Berg was asked if he had any offshore accounts or assets. In response to this question, Mr. Berg responded that he had consulted with an attorney who specialized in the protection of assets and the creation of offshore trusts. Mr. Berg admitted that he had the attorney create a Delaware based limited liability company, but claimed he never funded this LLC and claimed he did not go forward with the creation of an offshore trust.

On July 27, 2010, attorneys representing investors in CS Note Holdco began executing a State court writ of pre-judgment attachment to seize many of Mr. Berg's personal assets from his homes and office space. Although Sheriff's deputies began service of the writs, Mr. Berg rushed to file for personal bankruptcy that same day and the parties agreed to leave Mr. Berg's personal property in place. *See In Re: Frederick Darren Berg*, Case No. 10-18668 (Bankr. W.D. Wash.). On August 19, 2010, the

Memorandum in Support of Motion for Detention Hearing/- 4
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

bankruptcy court appointed Diana Carey as the Chapter 11 trustee for Mr. Berg's personal estate. As trustee for Mr. Berg's personal estate, Ms. Carey acquired all rights as representative of Mr. Berg's bankruptcy estate including Mr. Berg's rights as the owner and sole shareholder in his many business interests. On August 24, 2010, Mr. Berg signed consents for each of the business he listed on his bankruptcy schedules transferring control of the businesses to Ms. Carey.

Throughout August 2010, Mr. Berg's counsel repeatedly postponed a full debriefing with Mr. Berg citing a variety of reasons. These reasons included: vacation schedules of counsel, the need to sort through early disputes in the bankruptcy proceedings, and finally Mr. Berg's failure to reach an agreement with the bankruptcy trustee to provide him with a budget that would fund his criminal defense and a bankruptcy attorney. Although Mr. Berg would not participate in a government interview, he was meeting regularly with bankruptcy trustee Mark Calvert and his staff and providing them with information about his fraud scheme throughout July and August 2010. Mr. Calvert and his staff were gradually provided access to all of the Meridian funds bank records, accounting records, asset files, investors files and other records. Additionally, Mr. Calvert and his staff met regularly with Mr. Berg to discuss the Meridian Funds and how he committed the fraud that led to the bankruptcy. Mr. Calvert has told FBI agents and the United States Attorneys Office that Mr. Berg's assistance has proved valuable to his investigation and he wishes to continue working with Mr. Berg.

Mr. Berg's assistance to Mr. Calvert and his staff took several weeks to develop, however, and involved substantial disagreements with Mr. Berg and his attorneys at several points. Mr. Calvert and his staff contacted the FBI and the United States Attorneys Office regarding concerns about access to records and Mr. Berg's behavior on multiple occasions throughout July and August 2010. Among the challenges they encountered were: Mr. Berg's initial refusal to surrender control of certain bank accounts; Mr. Berg's initial refusal to surrender control over the post office box that receives the mail for all of his companies including the investment funds; Mr. Berg's

Memorandum in Support of Motion for Detention Hearing/- 5
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   efforts to open and fund new bank accounts without their knowledge; Mr. Berg's initial

2   refusal to provide access to banking records for Meridian Partnership Management and

3   MPM Investor Services; and incomplete access to records of other Meridian companies

4   that had received illegal transfers of money from the investment funds.

5       Mr. Berg's initial refusal to provide access to the records for Meridian Partnership

6   Management and MPM Investor Services was a substantial obstacle to the bankruptcy

7   trustee's investigation. Mr. Calvert described these companies as the "clearinghouse"

8   for the Meridian Funds. Meridian Partnership Management was the company that both

9   accepted investor deposits and purchased mortgage notes for the benefit of the Meridian

10   Funds. Throughout August 2010, Mr. Calvert told agents that despite his requests to

11   Mr. Berg and his counsel to relinquish control over Meridian Partnership Management

12   and MPM Investor Services, Mr. Berg had refused to place those companies in

13   bankruptcy or provide access to the records of those companies. According to

14   Mr. Calvert the bank records for the various funds showed significant amounts of money

15   had gone from the investment funds accounts to the accounts for Meridian Partnership

16   Management and MPM Investor Services. Therefore, the records of these two companies

17   were important to determine the scope of the fraud involved in the Meridian companies.

18   Mr. Calvert was not provided full access to these records until approximately August 30,

19   2010, over a month after Mr. Berg's counsel initially indicated that Mr. Berg wished to

20   fully cooperate.

21       During this time frame of July 16, 2010, through August 30, 2010, counsel for

22   Mr. Berg indicated that delays in providing access to records and conducting a full law

23   enforcement debriefing with Mr. Berg were the result of disagreements with the

24   bankruptcy trustee over a proposed budget to fund Mr. Berg's criminal defense counsel

25   and bankruptcy counsel as well as conflicts with a variety of vacation schedules.

26   Ultimately, Mr. Berg's original defense counsel withdrew and Mr. Berg obtained

27   approval for court appointed counsel through the Federal Public Defender's Office on

28   or about September 3, 2010.

Memorandum in Support of Motion for Detention Hearing/- 6
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

Based on the problems Mr. Calvert was experiencing with Mr. Berg's lack of cooperation and other concerns about the preservation of evidence and records, agents executed search warrants on August 30, 2010, at Mr. Berg's home on Mercer Island, Washington, as well as the Meridian office suite in Seattle, Washington. Among other things recovered during the search of Mr. Berg's office space were records related to a Delaware limited liability company in the name of DB517. *See* Attachment A. These records include an invoice from "Contract Management Inc." of Belize City, Belize dated June 30, 2010, addressed to Darren Berg "for reinstating the DB517 Trust and for all other professional services in relation thereto." The invoice also refers to "services rendered in liaising with Carlos Neuman of Panama Relocations Attorneys with regards to the usage of the shelf company Red Autumn Investment, Inc." Agents also discovered records for a U.S. based TD Ameritrade account in the name of DB517 LLC. The records did not indicate whether any funds had been transferred oversees. Agents have reviewed wire transfer records received from many of Mr. Berg's banks and have not found any transfers that appear related to the Belize trust or Red Autumn Investment Inc.

Agents finally met with Mr. Berg for a full debriefing on September 20, 2010. At that time, Mr. Berg was represented by new counsel from the Federal Public Defender's Office and he participated in a recorded interview that lasted approximately four hours. During the interview, Mr. Berg was represented by two attorneys from the Federal Public Defenders' office. He was advised that his presence was voluntary and that anything he said would be used against him as part of this prosecution. The entire interview was audio recorded. Mr. Berg provided a detailed overview of the history of his creation of Meridian Partnership Management and his investment funds as well as his criminal conduct. During the interview, agents asked Mr. Berg if he had any offshore accounts or if he had done anything to hide assets. Mr. Berg stated that in approximately March 2010, he was about to get caught and he confided in a local real estate developer with whom he was friends. This developer introduced him to an attorney who specialized in protecting assets through trusts in Belize. According to Mr. Berg he had the attorney

Memorandum in Support of Motion for Detention Hearing/- 7
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    create the DB517 trust but never transferred any funds to the trust. Mr. Berg admitted

2    that he had opened an account at TD Ameritrade in the name of DB517, and stated that

3    he deposited approximately $200,000.00 into this account. However, he claimed all but

4    approximately $2,000.00 of this money had been transferred back to his businesses.

5    Mr. Berg agreed to waive his attorney client privilege and allow us to speak to the

6    attorney who created the DB517 trust to confirm these facts. Mr. Berg, however, has yet

7    to provide the promised waiver of attorney-client privilege.

8         On September 27, 2010, Mr. Calvert and his staff provided an update on their

9    investigation and indicated they were continuing to conduct a forensic accounting of the

10   Meridian Funds bank records. At that time, Mr. Calvert stated that he and his staff were

11   meeting regularly with Mr. Berg and he was continuing to assist them with recreating the

12   history of the Meridian funds and his fraudulent scheme. Mr. Calvert stated that Mr. Berg

13   had been valuable in categorizing the types of inflows and outflows of funds as recorded

14   in the Quickbooks accounting records for the funds as well as his personal accounts.

15   According to Mr. Calvert, he had sought approval from the bankruptcy court to pay

16   Mr. Berg approximately $15,000.00 per month in exchange for his cooperation.

17   Mr. Calvert stated that in response to concerns raised by the government regarding this

18   compensation agreement, Mr. Berg had decided not to accept this compensation.

19   However, Mr. Calvert was concerned that as a result of this, Mr. Berg had obtained

20   alternative employment in Los Angeles, California and would not be available to assist

21   his investigation as regularly as he had in the past.

22         At this point, it appeared that Mr. Berg was being cooperative and generally

23   forthright with the bankruptcy trustees and the government. On the afternoon of

24   October 13, 2010, however, Andrew Wilson, a consultant working with bankruptcy

25   trustee Diana Carey contacted FBI Special Agent Steve Rausch with new information

26   regarding Mr. Berg's personal bankruptcy estate. Mr. Wilson told SA Rausch he had

27   recently discovered a new bank account in Mr. Berg's name at Union Bank. Although

28   Mr. Berg was specifically asked to list all bank currently accounts under his control

Memorandum in Support of Motion for Detention Hearing/- 8
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

during the September 20, 2010 interview, he did not say anything about an account at Union Bank.

Mr. Wilson told SA Rausch that he had discovered the Union Bank account on September 30, 2010, when he found a wire transfer receipt at Mr. Berg's Mercer Island home, which showed a wire transfer on September 17, 2010, in the amount of $145,000.00 from an account in the name of DB517 LLC at TD Ameritrade, to an account in the name of F Darren Berg at Union Bank. *See* Attachment B. Records for the Union Bank account show that Mr. Berg opened that account on September 9, 2010 with a $50,000.00 deposit and Mr. Berg deposited an additional $145,000.00 on September 17, 2010. The records from Union Bank then show that Mr. Berg immediately withdrew $116,030.00 from the account. *See* Attachment B, at 2. Records for the TD Ameritrade account show that Mr. Berg opened that account in February 2010. According to Mr. Wilson, Mr. Berg had never disclosed either of these accounts (the account at Union Bank or the account at TD Ameritrade) to the bankruptcy trustee and had not listed these accounts in his bankruptcy schedules. In addition, Mr. Berg had never told the bankruptcy trustee that he owned an interest in an LLC named DB517, and had not listed this company on his bankruptcy schedule.

According to Mr. Wilson, on Tuesday October 5, 2010, after the accounts were frozen, he asked Mr. Berg about the account at Union Bank, DB517 LLC and the TD Ameritrade account. Mr. Berg told Mr. Wilson that he did not think he had to disclose the Union Bank account because it was an account he opened after he filed bankruptcy. Mr. Berg also provided Mr. Wilson with a spreadsheet for the TD Ameritrade account that showed a deposit of $225,000.00 into the TD Ameritrade account on August 3, 2010. According to Mr. Wilson, Mr. Berg initially told him that this $225,000.00 came from a variety of sources. However, when pressed for more details, Mr. Berg told Mr. Wilson that some of the money came from two consulting contracts he had signed in early August 2010.

Memorandum in Support of Motion for Detention Hearing/- 9
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1         Mr. Berg provided copies of the contracts to Mr. Wilson and told him that DB517

2    LLC was a company he established to provide consulting services. According to Mr.

3    Wilson, Mr. Berg said he had not disclosed his interest in DB517 LLC because it was

4    created after he filed for bankruptcy and constituted a post-petition asset. As shown in

5    Attachment A, however, DB517 LLC was created in July 2009, and Mr. Berg has

6    admitted that he created this entity to help hide assets offshore..

7         Mr. Wilson said that Mr. Berg also claimed the $225,000.00 deposit into the

8    DB517 LLC account at TD Ameritrade represented post-petition earnings that he did not

9    believe he was required to disclose to the bankruptcy trustee. Mr. Wilson explained that

10   pursuant to an order entered in Mr. Berg's personal bankruptcy proceedings, he was

11   entitled to keep post-petition earnings (earnings for work after the date he filed his

12   petition for personal bankruptcy).

13        Special Agent Rausch, however, has determined that at least one of the two

14   consulting contracts is bogus and the company named in the second contract cannot be

15   located. Both contracts are dated August 1, 2010, and are identical with the exception of

16   the name of the company purportedly hiring Mr. Berg and the amount of compensation

17   called for in the contract. *See* Attachments C and D. Both contracts name DB517 LLC

18   as the "consultant" and Mr. Berg as the manager of DB517. Each contract calls for Mr.

19   Berg to consult on issues related to the ownership of a corporate jet. The first contract is

20   purportedly with K6 Aircraft Leasing. The other contract is purportedly with Boards

21   Aircraft LLC. The contract with Boards Aircraft LLC, is purportedly signed by "Greg

22   Clausson."

23        Special Agent Rausch interviewed Greg Clausen, the Director of Operations

24   for a company named Aero Air, a company associated with Boards Aircraft, that same

25   day - October 13, 2010. He asked Mr. Clausen if he and/or Boards Aircraft LLC had

26   recently hired Darren Berg in the past few months to perform any employment or

27   consulting duties for Boards Aircraft, LLC. Mr. Clausen said he "did not think" he had

28   hired Mr. Berg or agreed to use Mr. Berg's services as a consultant. Mr. Clausen also

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 stated that he was "nearly positive" that he did not sign a contract in the past few months
2 hiring Mr. Berg as an employee or a consultant. Mr. Clausen said he knows Mr. Berg and
3 was a friend of Mr. Berg. Mr. Clausen said he was not sure whether the owner of Boards
4 Aircraft, Mark Wattles, could have entered a consulting contract with Mr. Berg. After
5 reviewing a copy of the contract with his purported signature, however, Mr. Clausen
6 contacted SA Rausch on October 18, 2010, and stated that the signature on the contract
7 was not his signature and his name was actually misspelled on the contract.

8       Agent Rausch also interviewed the owner of Boards Aircraft LLC, Mr. Wattles,
9 who told him that he had never engaged in any transactions with Mr. Berg or any entity
10 associated with Mr. Berg other than trading the use of their respective airplanes. He said
11 he would not even consider hiring Mr. Berg as a consultant to Boards Aircraft LLC
12 because he does not believe Mr. Berg knows anything about airplanes. SA Rausch has
13 been unable to locate anyone associated with K6 Aircraft Leasing.

14       Agent Rausch also reviewed records from TD Ameritrade related to Mr. Berg's
15 account in the name of DB517 LLC. He found that on August 2, 2010, this account
16 received an incoming wire transfer in the amount of $225,000.00 from an account at Bank
17 of America in the name of Meridian-Greenfield LLC. Records for the Bank of America
18 account show that Mr. Berg opened this account just four days earlier on July 29, 2010,
19 and deposited a cashier's check in the amount of $398,773.57. *See* Attachment E. This
20 deposit was the source of the funds that made up the $225,000.00 wire transfer to Mr.
21 Berg's DB517 LLC account at TD Ameritrade and the later transfer of $145,000.00 to
22 Union Bank. The records from Bank of America show that in addition to wiring
23 $225,000.00 to his DB517 LLC account at TD Ameritrade, Mr. Berg also wired
24 $100,000.00 to an account in his name at Pacific Western Bank[1] on August 2, 2010, and
25 another $50,000.00 to a criminal defense attorney that same day. The remaining funds in
26 the account (including two smaller deposits of unknown origin) were all exhausted by
27 August 31, 2010. *See* Attachment G - Summary of Transactions.

28

---

[1] Mr. Berg disclosed his Pacific Western account to the bankruptcy trustee and the FBI.

Memorandum in Support of Motion for Detention Hearing/- 11
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    The cashier's check dated July 29, 2010, was drawn on Commerce Bank and had a
2    memo regarding "Lake Union Escrow." On October 15, 2010, Special Agent Daniel
3    Bennet contacted Lake Union Escrow and learned that the $398,773.57 cashier's check
4    represented the proceeds of a property sale. Lake Union Escrow provided copies of the
5    closing file related to that sale. Those records showed that the purchase and sale
6    agreement was related to a home in the Magnolia area of Seattle, Washington and was
7    initiated on July 19, 2010, between Meridian Greenfield LLC as the seller and Soleil LLC
8    as the buyer. All Meridian Greenfield documents in the file are signed by Darren Berg.
9    The documents from Lake Union Escrow indicate Mr. Berg signed the closing documents
10   on July 27, 2010, and the sale closed on July 28, 2010.

11       A further review of records from Mr. Berg's Union Bank account show that the
12   same day he wired $145,000.00 from his TD Ameritrade account to the Union Bank
13   account, he withdrew $116,030.00. These funds remain unaccounted for. According to
14   Mr. Wilson, Mr. Berg claimed he spent these funds establishing a new residence in Los
15   Angeles and performing initial work on his consulting agreements.

16       Finally, despite his claims that he has been fully cooperative with the bankruptcy
17   trustees' investigations, Mr. Berg has recently canceled multiple meetings with the
18   trustees and his cooperation has diminished. The same day charges were initially filed in
19   this case,[2] Mr. Berg was in Seattle, but abruptly canceled a planned meeting with Mr.
20   Calvert and flew back to Los Angeles. Over the next several days, he told the trustees he
21   would return to Seattle the following week for meetings with the trustees on Wednesday
22   October 20, 2010, and Thursday October 21, 2010. However, Mr. Berg canceled these
23   meetings also and told the trustees he decided to stay in Los Angeles. Mr. Calvert has
24   told the government that while Mr. Berg continues to speak with them, his cooperation
25   has diminished over the past several weeks and Mr. Berg has claimed he does not have as
26   much time available to assist the trustees for a variety of reasons.

27

28       [2] A ten count Information charging Mr. Berg with wire fraud and money laundering
     was filed the morning of October 14, 2010.

Memorandum in Support of Motion for Detention Hearing/- 12
Frederick Darren Berg, No. MJ10-442

## III.   Legal Framework

The government may move for detention in a case that involves either "a crime of violence," 18 U.S.C. 3142(f)(1)(A), or "a serious risk that such person will flee" 18 U.S.C. 3142(f)(2)(A), or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness," 18 U.S.C. 3142(f)(2)(B). The relevant statute requires that, should the Court conduct a detention hearing, it must consider all available pertinent information. Although a defendant may not be detained based solely on dangerousness unless one of the conditions listed in section 3142(f)(1) is present, *see United States v. Twine*, 344 F.3d 987 (9th Cir. 2003), in cases involving serious risk of flight or risk of obstruction of justice, the court must also consider the nature and seriousness of the danger to the community presented by defendant's release, see 18 U.S.C. § 3142(g)(4). The Ninth Circuit has held "that danger may, at least in some cases, encompass pecuniary or economic harm." *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992).

In making a determination with respect to pre-trial detention, the Court must evaluate several enumerated factors to determine "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. . . ." 18 U.S.C. § 3142(g). These factors include:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, or an offense listed in section 2332(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including -

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law, and;

Memorandum in Support of Motion for Detention Hearing/- 13
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    (4) the nature and seriousness of the danger to any person or the community that
2    would be posed by the person's release.

*Id.* The Court must balance all of these factors in determining whether a defendant

3    should be detained pending trial.

It is well-settled that at a detention hearing the government may present evidence

5    by way of an evidentiary proffer sufficient to make the court aware of the defendant's role

6    in the offense, the weight of the evidence against the defendant, and other relevant

7    factors. *See, e.g., United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v.*

8    *Winsor*, 785 F.2d 755 (9th Cir. 1986). At the detention hearing in this case, the United

9    States intends to proffer evidence of Mr. Berg's risk of flight as well as his danger to the

10   community and the risk that he will obstruct justice.

11   The standards of proof differ with respect to the "risk of flight" and

12   "dangerousness" prongs of the statute. A detention order based on the defendant's risk of

13   flight must be supported by a preponderance of the evidence. *United States v. Motamedi*,

14   767 F.2d 1403 (9th Cir. 1985). A detention order based on the defendant's dangerousness

15   must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f).

## IV.   Argument

### A.   The evidence establishes that defendant presents a serious risk of flight, a serious risk to obstruct justice, and that he is a danger to the community.

The evidence in this case demonstrates that Mr. Berg is a substantial risk of

flight such that no condition or combination of conditions will reasonably assure his

future appearances in Court. In addition, the evidence demonstrates that Mr. Berg is a

serious risk to obstruct justice. As shown above, the government has obtained evidence

that Mr. Berg established a trust in the name of DB517 in the Central American country

of Belieze. Although Mr. Berg has provided some details regarding his establishment of

a U.S. based limited liability company in the name of DB517, Mr. Berg lied to the

government and claimed he had not gone forward with plans to create the actual offshore

trust. In addition, Mr. Berg lied to the government when he claimed that he had placed

approximately $200,000.00 in a bank account in the name of DB517, but said he had

Memorandum in Support of Motion for Detention Hearing/- 14
Frederick Darren Berg, No. MJ10-442

returned all but $2,000.00 of this money to his businesses.  In fact, as the evidence now

shows, Mr. Berg placed substantially more funds into the TD Ameritrade account in the

name of DB517 and did not return any of those funds to his businesses.

In addition, the evidence now shows that the funds Mr. Berg placed into the

DB517 account were stolen from the bankruptcy estate and that Mr. Berg actively sought

to conceal these assets from the bankruptcy court and to obstruct the Chapter 11 trustee's

investigation of the nature of these funds.  While Mr. Berg told the Chapter 11 trustee that

these funds constituted post-petition earnings for the performance of two consulting

agreements, the evidence shows that at least one of the consulting agreements Mr. Berg

presented to the trustee is false and that the source of the funds was in fact the sale of an

asset that was part of the bankruptcy estate.  Mr. Berg's lies to the Chapter 11 bankruptcy

trustee and his fabrication of fake consulting agreements in an attempt to conceal assets

from the bankruptcy trustee and the bankruptcy court all took place while Mr. Berg was

attempting to portray himself as a cooperative and remorseful defendant who could be

trusted while on pretrial release.  This conduct demonstrates that no conditions or

combination of conditions will reasonably assure the safety of any other person and the

community and that Mr. Berg is a serious risk of flight and a serious risk to obstruct of

justice.  As will be shown below, all four factors set forth in the Bail Reform Act strongly

militate in favor of detention.

**B.     The nature and circumstances of the offenses favors detention.**

Mr. Berg's wire fraud scheme is the largest Ponzi scheme ever prosecuted in the

Western District of Washington.  The losses from his ten year scheme to defraud his

investors are well over $100 million.  The scheme involved an extraordinary level of

sophistication and manipulation.  Indeed, Mr. Berg has admitted that in order to

perpetuate his scheme, he spent countless hours fabricating documents to mislead

investors and independent auditors.  Mr. Berg's ability to fabricate documents, deceive

hundreds of educated professionals and manipulate the truth for nearly a decade

demonstrates that it would be impossible to effectively supervise him while on pretrial

Memorandum in Support of Motion for Detention Hearing/- 15
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

release and that condition or combination of conditions will reasonably assure his future appearances in Court or the safety of the community.

More significantly, however, is Mr. Berg's recent Bankruptcy Fraud which involved concealing substantial assets from the Chapter 11 trustee and the bankruptcy court as well as concerted efforts to obstruct the trustee's investigation of those assets. This conduct is especially egregious in light of Mr. Berg's attempt to deceive the government, the Chapter 11 trustees and the bankruptcy court into believing that he was going to be cooperative and work towards making his victims whole. The funds Mr. Berg has concealed are the very assets he claims he is cooperating with the trustees to make available for distribution to the victims of his massive fraud scheme. This conduct shows that Mr. Berg simply cannot be trusted to comply with any conditions of release and that pretrial supervision would be insufficient to reasonably assure his future appearances or the safety of the community.

### C. The weight of the evidence supports detention.

Although the Ninth Circuit has held that the weight of the evidence is the least important statutory factor, *see Motamedi*, 767 F.2d at 1403, this factor is relevant to a risk of flight analysis because a defendant's tendency to flee increases with the strength of the evidence against him and the likelihood of conviction at trial. That is, the stronger the evidence of guilt, the greater the likelihood that a defendant will flee or not return to face the charges levied against him, and thus the more important the need for pre-trial detention.

The weight of the evidence against Mr. Berg is incredible. He has fully admitted to his massive fraud scheme and provided an extensive recorded confession to the government. There is simply no question that he will be convicted and sentenced to an extremely long period in prison. Based on the government's tentative calculation of the United States Guidelines, Mr. Berg will face an advisory guideline range of 360 months to life in prison. *See* Attachment F - Tentative Guideline Calculations. Should Mr. Berg be convicted following a trial, his guideline range is off the chart. These severe penalties

Memorandum in Support of Motion for Detention Hearing/- 16
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

create a strong incentive to flee prosecution, especially for a defendant who has never before served any time in prison.

### D.    The history and characteristics of the defendant support detention.

The history and characteristics of the person encompasses several components including the person's character, mental condition, family ties, employment, financial resources, community ties, past conduct, and criminal history.  18 U.S.C. § 3142(g)(3)(A).  Mr. Berg's history and characteristics are those of a career criminal and master manipulator who cannot help but lie.  Unlike the vast majority of majority of defendants charged with operating a Ponzi scheme, Mr. Berg has a prior Federal criminal history.  In 1989, Mr. Berg was convicted of Bank Fraud in the District of Oregon.  This conviction was related to a check kiting scheme in which Mr. Berg stole approximately $30,000.00.  Shortly after this conviction, in the early 1990's, Mr. Berg was investigated by the FBI in Vancouver, Washington in relation to a scheme to sell fraudulent accounts receivables.  Although this case was never prosecuted, Mr. Berg recently admitted that he did in fact engage in a scheme in which he defrauded a victim of $80,000.00 by selling a fake account receivable.  At the time Mr. Berg committed this new fraud, he was still serving his five year term of probation for his prior bank fraud. As the Supreme Court noted in *United States v. Salerno*, 481 U.S. 739, 742 (1987), the Bail Reform Act was passed specifically in response to "the alarming problem of crimes committed by persons on release." *Id.* citing S.Rep. No. 98-225, p. 3 (1983), U.S. Code Cong. & Admin. News 1984, pp. 3182, 3185.  Mr. Berg's long history of fraud heavily outweighs other factors that might support his release.

Several of Mr. Berg's other characteristics also support detention.  Most notably, Mr. Berg's lack of legitimate employment demonstrates that he is not tied to any current employment obligations.  In addition, Mr. Berg's efforts to fabricate evidence of employment show that he is a risk to obstruct justice and that he cannot be trusted to deal honestly with pretrial services.  Mr. Berg's financial resources are also an extremely troubling factor that supports detention.  It is now clear that Mr. Berg has managed to

Memorandum in Support of Motion for Detention Hearing/- 17
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

steal approximately $400,000.00 from the bankruptcy estate. The disposition of a substantial portion of these funds remains unknown. Therefore, Mr. Berg likely has access to well over a hundred thousand dollars that he could use to finance his flight from prosecution.

Mr. Berg's lack of stable community ties are also a reason for detention. Since his crimes have come to light, Mr. Berg has cut his ties to the Seattle, Washington area and established a new home in Los Angeles. He has told the bankruptcy trustees that he moved to Los Angeles in order to work on his consulting agreements. This claim, however, is false in regards to at least one of his purported consulting contracts and appears likely to be entirely false. Therefore, Mr. Berg's ties to the Los Angeles area are tenuous at best. In light of the fact that Mr. Berg's employment in Los Angeles appears fake, and he has substantially curtailed his community ties to Seattle, Mr. Berg has no stable community ties that would mitigate his risk of flight. Moreover, his current residence in Los Angeles is troubling in light of the proximity to the southern U.S. border and his admitted plans to flee to Central America.

Finally, one of the most important conditions of pretrial release imposed on any defendant who is granted bail is the condition that he not commit any further crimes. Indeed, this is a mandatory condition that must be in every bond. *See* 18 U.S.C. § 3142(b) and (c)(1)(A). Yet, Mr. Berg's history and characteristics show that he is willing and able to completely ignore such important Court restrictions and evade detection by law enforcement. This history demonstrates that no condition or combination of conditions will reasonably assure the safety of any other person or the community and that he cannot be trusted to appear for court.

**E.   The nature and seriousness of defendant's danger to the community and any other person supports detention.**

The nature and seriousness of Mr. Berg's danger to the community is substantial. While the concept of dangerousness typically focuses on crimes of violence, in fact, white collar crimes pose serious dangers. The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of any other person or the

Memorandum in Support of Motion for Detention Hearing/- 18
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    community" language in Section 3142 was expected to be given a broad construction.

2    See Report of the Senate Committee on the Judiciary, S. Rep. No. 225, 98th Cong., 1st

3    Sess. 12 (1983) ("the reference to safety of any other person is intended to cover the

4    situation in which the safety of a particular identifiable individual, perhaps a victim or

5    witness, is of concern, while the language referring to the safety of the community refers

6    to the danger that the defendant might engage in criminal activity to the detriment of the

7    community.  The Committee intends that the concern about safety be given a broader

8    construction than merely danger of harm involving physical violence.").  This legislative

9    history was cited with approval in *United States v. King*, 849 F.2d 485 (11th Cir. 1998).

10         Courts have appropriately construed the statute to find that protection of the

11   community from economic harm is a valid objective of bail conditions.  *See United States*

12   *v. Reynolds*, 956 F.2d 192, 193 (9th Cir. 1992) (post-conviction for mail fraud and

13   witness tampering, the Court held that for purposes of detention, "danger may, at least in

14   some cases, encompass pecuniary or economic harm"); *see also United States v.*

15   *Giordano*, 370 F.Supp.2d 1256, 1270 (S.D. Fla. 2005) ("no question that an economic

16   danger, like that posed by a serial defrauder, falls under the broad umbrella of

17   'dangerousness' as that term is used throughout the Bail Reform Act"); *United States v.*

18   *Madoff*, 586 F.Supp.2d 240, 253 and n. 11 (S.D.N.Y. 2009) (Court accepted that "in

19   certain circumstances an economic or pecuniary harm may give rise to a consideration of

20   danger" for purposes of pretrial detention and noted that "[t]he question appears to

21   become one of propensity to commit further crimes, even if the resulting harm is solely

22   economic").

23         Mr. Berg's conduct in this case, which was a long-term concerted plan to steal

24   millions of dollars from hundreds of victims, was followed by new criminal conduct

25   committed while falsely portraying himself as forthright and cooperative with the

26   government's investigation and that of the Chapter 11 bankruptcy trustees.  This

27   willingness to commit new crimes while under the microscope of an FBI investigation

28   and two bankruptcy court investigations, demonstrates that Mr. Berg posses the highest

Memorandum in Support of Motion for Detention Hearing/- 19
Frederick Darren Berg, No. MJ10-442

1 degree of economic danger to the community. Indeed, anyone willing to engage in such
2 reckless, irrational criminal conduct is totally unworthy of the court's trust.
3     Mr. Berg's release also presents a serious risk of obstruction of justice. Despite
4 exhaustive efforts to track all of the proceeds of Mr. Berg's crimes, Mr. Berg has
5 managed to steal nearly $400,000.00 from the bankruptcy estate at the same time he has
6 been sitting down with the government and claiming to be cooperative. Mr. Berg has
7 blatantly lied to the FBI about what bank accounts he controls, he has submitted false and
8 misleading bankruptcy schedules to the U.S. Bankruptcy Court, and he has submitted
9 false documents to the Chapter 11 trustee. This conduct was designed solely to obstruct
10 both the FBI investigation and the Chapter 11 trustee's investigation of his criminal
11 conduct and shows that no conditions of release will effectively curtail his behavior.
12 //
13
14 //
15
16 //
17
18 //
19
20 //
21
22 //
23
24 //
25
26 //
27
28 //

Memorandum in Support of Motion for Detention Hearing/- 20
Frederick Darren Berg, No. MJ10-442

1 **V.    Conclusion**

2        Defendant is asking this Court to trust him and his promise to appear at future

3 court hearings and not engage in any additional criminal behavior. Yet everything about

4 the nature and circumstances of this case and defendant's history and characteristics

5 shows that he cannot be trusted. Defendant has shown a willingness and ability to

6 engaged in egregious criminal conduct and obstruction of justice during a FBI

7 investigation and a Federal Bankruptcy Court investigation with which he was

8 purportedly cooperating. Moreover, Defendant presents an ongoing and substantial

9 economic danger to the community that should not be over looked. *See U.S. v. Reynolds,*

10 956 F.2d 192, (9th Cir. 1992) (danger may encompass pecuniary or economic harm). For

11 the foregoing reasons, the government respectfully requests that this Court order Mr. Berg

12 detained pending trial.

13        DATED this 22nd day of October, 2010.

14

15                                        Respectfully submitted,

                                          JENNY A. DURKAN
16                                        United States Attorney

17
                                          */s/ Norman M. Barbosa*
18                                        NORMAN M. BARBOSA
                                          Assistant United States Attorney
19                                        United States Attorney's Office
                                          700 Stewart Street, Suite 5220
20                                        Seattle, WA 98101-1271
                                          Phone No.:    (206) 553-4937
21                                        Fax No.:      (206) 553-2502
                                          Email: Norman.Barbosa.usdoj.gov

22

23

24

25

26

27

28

Memorandum in Support of Motion for Detention Hearing/- 21
Frederick Darren Berg, No. MJ10-442

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

# CERTIFICATE OF SERVICE

2      I hereby certify that on October 22, 2010, I electronically filed the foregoing with

3  the Clerk of Court using the CM/ECF system which will send notification of such filing

4  to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the

5  attorney(s) of record for the defendant(s) that are non CM/ECF participants via facsimile.

6

7

8              s/Anna Chang
               ANNA CHANG
9              Paralegal
               United States Attorney's Office
               700 Stewart Street, Suite 5220
10             Seattle, Washington 98101-1271
               Telephone:   (206) 553-2274
11             Facsimile:   (206) 553-2502
               E-mail:  Anna.Chang@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

# ATTACHMENT A

# CONTRACT MANAGEMENT INC.

## PROFORMA INVOICE

Date: 30th June, 2010
Invoice#: Prof-98/2010

| Bill To: | |
|---|---|
| DB517 Trust<br>C/o Darren Berg | |

| Description | Amount |
|---|---|
| **DB517 Trust** | |
| **Services (inclusive of disbursements)** | |
| For reinstating the DB517 Trust and for all other professional services in relation thereto | $5000.00 |
| Bank Charges (incoming transfer fees) | $ 10.00 |
| (Note: Kindly transfer funds to Horizons Financial Services Bank Account as per the attached wire instructions) | |
| **Total** | **US$5,010.00** |

40A Central American Blvd., Belize City, Belize, Central America
Telephone: 501-227-1336  Facsimile: 501-227-0227
Email: infocmi2010@gmail.com

# CONTRACT MANAGEMENT INC.

## PROFORMA INVOICE

Date: 30th June, 2010
Invoice#: Prof-99/2010

| Bill To: | |
|---|---|
| Red Autumn Investment, Inc<br>C/o Darren Berg | |

| Description | Amount |
|---|---|
| **Red Autumn Investment, Inc. (Panamanian IBC and Protect Cell Account)** | |
| **Services** | **$5,000.00** |
| ➤ For services rendered in liaising with Carlos Neuman of Panama Relocations Attorneys with regards to the usage of the shelf company Red Autumn Investment, Inc; | |
| ➤ For forwarding the necessary information to Carlos Neuman as required for the changes to be effective in the Red Autumn Investment, Inc.; | |
| ➤ For reviewing the file of Red Autumn Investment, Inc. and preparing the applications necessary for the registration of the company as a Protected Cell Account; | |
| ➤ For liaising with the Registrar of Protected Cell Companies with regards to the registration of of Red Autumn Investment, Inc as a Protected Cell Account; | |
| ➤ For travelling to the International Financial Service Commission Office in Belmopan for the registration of the Protected Cell Account under a Protected Cell Company and for all other professional services in relation thereto. | |

| **Disbursements** | | |
|---|---|---|
| - Director fees for 2010 | | $2000.00 |
| - Panamanian Shelf Corporation/Change of BOD | | $1352.50 |
| - Outgoing bank charges fee (Panama Fees) | | $   75.00 |
| - Cell Account Fees (IFSC) | | $  800.00 |
| - Belmopan Mileage Fee | | $  137.50 |
| - Office Expenses | | $  135.00 |
| | Sub-Total: | $4,500.00 |

(Note: Kindly transfer funds to Horizons Financial Services
Bank Account as per the attached wire instructions)

| **Total** | **US$9,500.00** |
|---|---|

# DB517 LLC
## Operating Agreement Abstract

This Abstract of the DB517 LLC Operating Agreement is effective as of July 29, 2009 by and between **Darren Berg**, as Manager, and **Darren Berg**, as Member, of **DB517 LLC**.

## RECITALS

A.   **DB517 LLC**, a Delaware series limited liability company, was formed on July 29, 2009 pursuant to a Certificate of Formation filed with the Secretary of State of the State of Delaware. It is a disregarded entity for tax purposes, and owned by **Darren Berg**.

B.   The parties wish to enter into this Abstract to summarize the governance, management, and operation of **DB517 LLC** and the disposition of the limited liability company.

BASED UPON THE ABOVE RECITALS, the parties promise and agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1     Definitions.**   When used in this Agreement, the following terms shall have the following meanings:

**1.1.1**   "Agreement" shall mean this Agreement, as amended from time to time.

**1.1.2**   "Interest" shall mean the ownership Interest of a Member in the LLC in any series at any particular time, and all rights and obligations attributable thereto.

**1.1.3**   "LLC" shall mean **DB517 LLC**, a Delaware series limited liability company.

**1.1.4**   "Manager" shall mean for the LLC, and each series:

**Darren Berg**

## ARTICLE 2
## FORMATION AND CERTAIN ACTIVITIES OF LLC

**2.1**  **Formation.**  The LLC is a series LLC under Delaware law.  Assets of the LLC may be segregated into separate series.

**2.2**  **Term.**  The term of the LLC shall commence upon July 29, 2009 and will continue until the LLC is dissolved.

**2.3**  **Name.**  The name of the LLC shall be **DB517 LLC.**

**2.4**  **Fiscal Year.**  The fiscal year of the LLC shall end on December 31 of each year.

**2.5**  **Offices.**  The principal office of the LLC shall be located at: 1640 72nd Avenue NE, Mercer Island, WA 98040 or at such other location as the Manager(s) shall designate from time to time.

## ARTICLE 3
## MEMBERS, CAPITAL CONTRIBUTIONS AND LOANS

**3.1**  **Capital Contribution of the Members.**  The capital contribution of each Member shall be as indicated on Schedule "A" attached hereto and incorporated herein by this reference.

**3.2**  **Other Business of Members.**  Any Member may engage independently or with others in other business and investment ventures of every nature and description and shall have no obligation to account to the LLC for such business or investments or for business or investment opportunities.

**3.3**  **Additional Members.**  Additional members shall not be admitted except upon the unanimous vote of the Members.

**3.4**  **Voting Rights.**  All Members shall have voting rights. A majority vote shall be required to pass any actions for the LLC in general and for any series.

## ARTICLE 4
## DISTRIBUTIONS AND ALLOCATIONS

**4.1**  **Annual Distributions.**  Distributions will be made to Members as of December 31 of each year in the amount of the cash flow then available.

**4.2**  **Allocations.**  Items of income, gain, deduction, loss, and credit of the LLC for each fiscal year shall be determined as of the end of such fiscal year and allocated among the Members in accordance with their respective Interests.

## ARTICLE 5
## MANAGEMENT OF THE LLC

**Management.** Management of the day to day business and affairs of the LLC shall be by the Manager(s). Management of a series shall be determined by the Manager(s) for that series. All decisions that are not contrary to the terms of this Agreement shall be binding upon the LLC and each of the Members.

## ARTICLE 6
## BANK ACCOUNTS AND BROKERAGE ACCOUNTS

**Bank and Brokerage Accounts.** All LLC funds shall be used only for LLC business purposes and shall be deposited in and withdrawn from an account with such bank as the Manager(s) agree. The Manager(s) shall be authorized to open and sign on any bank or brokerage accounts for the LLC and its series.

## ARTICLE 7
## TRANSFER OF INTERESTS

**7.1  General.** Transfer of a Member's Interest in the LLC or in a series will not be allowed without first offering it to the other Member(s) of the LLC or such series. The purchase price for such Interest shall be based upon the value as mutually agreed upon by all Member(s) of such series. If the Member(s) cannot agree, then the Manager(s) shall obtain an independent certified appraisal of the fair market value of the LLC. Each member shall be allowed to transfer his, her, or its Interest into a trust or other entity for estate planning purposes without the consent of other members.

**7.2  Third Party Transfers.** A Member may engage in a transfer to a third party only after the Member desiring to sell has first complied with the terms and conditions of Section 7.1 by offering his, her, or its Interest to the other Member(s) and such other Member(s) have not accepted the offer.

**7.3  Rights of Assignee.** A transferee of a Member's Interest shall not be admitted as a Member and shall not have the rights or duties of a Member under this Agreement without the written consent of the other Member(s) and Manager(s) of the LLC and series, and without such consent, such transferee shall be entitled only to receive allocations of income, gain, loss, deduction, credit, and distributions from the LLC attributable to the Interest acquired by reason of the transfer; provided, however, that the non-transferring Member(s) shall be entitled to treat the transferor as the absolute owner of the transferred Interest and shall incur no liability for distributions or allocations or distributions made in good faith to the transferor, until such time as the documents evidencing the transfer have been received by and recorded on the books of the LLC. Further, a transfer hereunder shall not relieve the transferor of his, her, or its duties and obligations under this Agreement incurred prior to the transfer.

# ARTICLE 8
## DEFAULTS

**8.1   Events of Default.**  The occurrence of any of the following events shall, at the election of a non-defaulting Member, constitute a default ("Event of Default") on the part of any Member with respect to which such event occurs:

**8.1.1**   The failure of any Member to perform, observe or comply with any other covenant, representation, obligation or condition to be performed, observed or complied with by the Member hereunder within thirty (30) days following delivery to such Member of written demand by the Manager(s);

**8.1.2**   The transfer of any Member's Interest in violation of the provisions of Article 7.

**8.2   Election to Dissolve.**  If a Non-Defaulting Voting Member does not elect to acquire the Interest of the Defaulting Member of a series, the Non-Defaulting Voting Members holding at least a 50% Interest in the LLC or such series, may, at the Non-Defaulting Voting Member(s) option, elect to dissolve the LLC or such series pursuant to Article 9 by giving written notice thereof to the Defaulting Member within ninety (90) days of the occurrence of an Event of Default as to the Defaulting Member.  Failure of the Non-Defaulting Voting Member(s) to deliver such written notice within the ninety (90) day period shall constitute waiver of the election provided by this Subsection 8.2.

# ARTICLE 9
## DISSOLUTION AND WINDING UP

**9.1.   Events of Dissolution.**  The LLC and each of its series shall be dissolved upon the occurrence of any of the following:

**9.1.1**   Upon the written consent of all of the Manager(s) and Member(s) thereto;

**9.1.2**   The sale or other disposition by the LLC of all or substantially all of its assets, unless the Member(s) elect to continue the LLC business for the purpose of the receipt and collection of any consideration to be received in exchange for the assets of the LLC (which activities shall be deemed to be a part of the winding up of the affairs of the LLC);

**9.1.3**   The election by the Non-Defaulting Member(s) to dissolve the LLC as provided in Section 8.2 of this Agreement.

**9.2   Termination and Winding Up.**

**9.2.1**   If the LLC is dissolved, (a) the affairs of the LLC shall be immediately terminated and wound up, (b) an accounting shall be made, (c) the liabilities of the LLC (including, without limitation, liabilities owed to the Members with respect to funds advanced, properties sold and services rendered to the LLC) shall be paid or adequately provided for,

and (d) the remaining assets of the LLC shall promptly be liquidated and any remaining assets shall be distributed to the Member(s) in accordance with Article 4 of this Agreement.

9.2.2 During any winding-up period the Member(s) and the Manager(s) shall continue to act and make all decisions relating to the conduct of any business or operation of the LLC and each series, in accordance with the terms and conditions of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

**10.1 Governing Law.** This Agreement shall be governed by the laws of the State of Delaware.

**10.2 No Assignment.** No party hereto shall assign his, her, or its rights, or delegate his, her, or its obligations, under this Agreement unless and until any such assignment or delegation shall first be consented to in a written instrument executed by all of the other parties hereto.

**10.3 No Benefit to Other Parties.** None of the provisions hereof shall inure to the benefit of any person other than the parties hereto, their respective successors and permitted assigns, nor shall they be deemed to create any rights, benefits or privileges in favor of any person except the parties hereto.

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed and delivered this Agreement as of the day and year first above written.

DATED this 29th day of July, 2009.

**DB517 LLC**

MANAGER: _____ 7/29/09
Darren Berg

MEMBER: _____ 7/29/09
Darren Berg

## SCHEDULE "A"

## MEMBERS INITIAL CONTRIBUTION

### DB517 LLC

| Name of Member | Voting Interest | Initial Capital Contribution |
|----------------|-----------------|------------------------------|
| Darren Berg | 100% | Formation costs with the value as shown on the books of the Company. |

\* This Membership Information Schedule may be amended from time to time in the discretion of the Company Manager(s) without the written agreement of the Members, to the corresponding Voting Interests of each Member.

DB517 Operating Agreement
ABSTRACT

Page 6 of 6

**Vigal & Simon, Inc.**
One Union Square, Suite 2401
600 University
Seattle, Washington 98101 USA

Darren Berg
1640 - 72nd Ave. NE
Mercer Island, WA 98040

SEATTLE WA

Hasler

$00.440

09/08/2009
Mailed from 98101
US POSTAGE

## Vigal & Simon, Inc.

One Union Square, Suite 2401

600 University

Seattle, Washington 98101 USA

Phone 206.728.5150

Facsimile 206.728.5140

www.vigalsimon.com

September 8, 2009

Darren Berg
1640 - 72nd Ave. NE
Mercer Island, WA 98040

Re: DB517 Trust

Dear Darren,

Please sign both of the enclosed Appointment to the Advisory Committee forms. Keep one for your records and send the other one back to our office.

Thank you.

Very truly yours,

*Judith Anderson*

Judith Anderson
Legal Secretary

Encls.

# DB517 TRUST

## APPOINTMENT TO THE

## ADVISORY COMMITTEE

Compass S.A. as Protector of the DB517 Trust is appointing Darren Berg to act as the Advisory Committee for the Protector. The Advisory Committee shall have the right to veto any actions of the Protector if they would be detrimental to the best interests of the Trust. The Protector shall give the Advisory Committee written notice of any intended action at least 14 days before any action is taken. Proof of delivery of the notice is required before the 14 day time frame begins to run. This appointment is effective immediately upon the execution of this document.

Dated this 31st day of July, 2009

Compass S.A. (Protector)

By: Olivia Gilharry, Director

Accepted by:

_____

Darren Berg

# DB517 TRUST

## APPOINTMENT TO THE

## ADVISORY COMMITTEE

Compass S.A. as Protector of the DB517 Trust is appointing Darren Berg to act as the Advisory Committee for the Protector. The Advisory Committee shall have the right to veto any actions of the Protector if they would be detrimental to the best interests of the Trust. The Protector shall give the Advisory Committee written notice of any intended action at least 14 days before any action is taken. Proof of delivery of the notice is required before the 14 day time frame begins to run. This appointment is effective immediately upon the execution of this document.

Dated this 31st day of July, 2009

Compass S.A. (Protector)

By: Olivia Gilharry, Director

Accepted by:

_____

Darren Berg

# ATTACHMENT B



 **UnionBank**

# STATEMENT OF ACCOUNTS

Page 1 of 1
Statement Number: 3220055425
09/09/10 - 09/22/10

UNION BANK
PALM SPRINGS OFFICE 322
PO BOX 512380
LOS ANGELES    CA  90051-0380

**Telephone Banking**
For 24-hour Automated Direct Service
800-238-4486
800-826-7345(TDD)
Representatives are available
from 6 am to 11 pm

To open additional accounts,
or apply for loans, call your
banking office at 760-323-4241

F DARREN BERG
1640 72ND AVE SE
MERCER ISLAND WA 98040

Visit us at unionbank.com

Thank you for banking with us
since 2010

■ *Enjoy discounts of 5% to 20% or receive other benefits when you use your Union Bank Debit Card at popular merchants with the MasterCard MarketPlace program. Learn more at www.marketplace.mastercard.com.*

## Tiered Interest Checking Summary

Account Number: 3220055425

Days in statement period: 14

| | | | | | |
|---|---|---|---|---|---|
| Balance on 9/9 | $ | 0.00 | | | |
| Additions | | 195,000.26 | **Interest** | | |
| Subtractions | | -116,043.00 | Paid this period | $ | 0.26 |
|   Other withdrawals | -116,043.00 | | Paid year-to-date | $ | 0.26 |
| Balance on 9/22 | $ | 78,957.26 | **Interest Rates** | | |
| | | | 9/9/10-9/22/10 | | 0.01% |
| **Statement Average Ledger Balance** | | 62,410.16 | Annual Percentage Yield | | 0.01% |

## Additions

| Date | Description/Location | Reference | | Amount |
|---|---|---|---|---|
| 9/9 | OFFICE DEPOSIT # 0001169204 | 76458047 | $ | 50,000.00 |
| 9/17 | V091810 | 99553154 | | 145,000.00 |
| 9/22 | INTEREST PAYMENT | | | 0.26 |
| **Total** | | | $ | **195,000.26** |

## Other withdrawals *Including fees and adjustments*

| Date | Description/Location | Reference | | Amount |
|---|---|---|---|---|
| 9/17 | V091810 | 99553155 | $ | 13.00 |
| 9/17 | WITHDRAWAL # 0003630806 | 77183557 | | 116,030.00 |
| **Total** | | | $ | **116,043.00** |

# ATTACHMENT C

# CORPORATE AVIATION
## CONSULTING AGREEMENT

THIS CORPORATE AVIATION CONSULTING AGREEMENT (hereinafter referred to as the "**Agreement**") made the 1st day of August 2010, between BOARDS AIRCRAFT, LLC (hereinafter referred to as "**Boards**") and DB517, LLC (hereinafter referred to as the "**Consultant**").

### WITNESSETH:

WHEREAS, Boards desires to engage the services of the Consultant in the capacity hereinafter stated, and the Consultant is desirous of serving Boards in such capacity for the period of time noted herein and on the terms and conditions as set forth herein; and

WHEREAS, the services of the Consultant are unique, extraordinary and not readily replaceable due to his particular expertise and knowledge in himself previously owning and operating a multiple aircraft corporate flight department;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereto do hereby agree as follows:

1. SERVICES AND DUTIES.

   (a) Boards hereby engages the Consultant to provide the services set forth in Paragraph 1 (b) below (the "**Consulting Services**") to Boards and the Consultant accepts such engagement and agrees to provide Boards the rendition of the Consulting Services, faithfully and to the best of his ability.

   (b) The Consultant shall produce and deliver a comprehensive report that studies and makes recommendations regarding the following aspects of the ownership and operation by Boards of its corporate jet aircraft: aircraft ownership structure, financing structure, registration structure (including coordinating a review by others of the taxation structure Oregon vs. Colorado), insurance structure (including coordinating a review by others of participation in an offshore insurance captive vs. "first dollar" conventional policies), fuel purchasing contracts (including coordinating a review by others of fuel hedging strategies), FAR Part 91 vs. FAR Part 135 operation (including coordinating the financial modeling by others of operations at varying annual hourly usage levels), FBO selection and negotiation of hangar space, charter certificate placement (if FAR Part 135 operations are deemed feasible), flight department staffing (including a review of current personnel and recommendations for staffing), safe operations (including coordinating a safety audit and coordinating the writing of flight department standard operating procedure manuals, all safety related items to be performed by an appropriately accredited and qualified safety consultant whose final report will be acceptable to current

and future insurers and lenders), aircraft maintenance (including coordinating a review of current maintenance procedures and coordinating the development of flight department standard operating procedures for maintenance, all maintenance related items to be performed by an appropriately accredited and qualified aircraft maintenance professional knowledgeable in the brand, make and model of aircraft operated by Boards, said report(s) to be acceptable to current and future insurers and lenders), review airframe and engine maintenance (i.e. "power by the hour") contracts and recommend participation levels, and review dispatch and mission requirements (overlaying same against brand, make and model of aircraft available) and make recommendations for aircraft acquisition.

(c) Consultant shall further render such other services as may be reasonably requested of him by the President of Boards.

2. TERM OF ENGAGEMENT.  The term of the Consultant's engagement hereunder shall become effective on August 1, 2010, and shall end on January 31, 2011. The engagement may be renewed upon similar terms by the mutual agreement of the parties.

3. CONFIDENTIAL INFORMATION.  All records of Boards which include, but are not limited to data processing reports, computer software and/or media containing its confidential information, travel patterns, strategic acquisition and growth plans, or any other materials or data of any kind furnished to Consultant by Boards, acquired by Consultant while engaged by Boards, or developed by Consultant on behalf of Boards or at its direction or for its use or otherwise in connection with Consultant's engagement hereunder, are and shall remain the sole and confidential property of Boards. Consultant acknowledges that such information are the proprietary trade secrets of Boards. All or any such materials and records shall hereinafter be known as "**Confidential Information**." If Boards requests the return of such Confidential Information at any time during, at, or after the termination of Consultant's engagement hereunder, Consultant shall immediately deliver the same and all copies or excerpts thereof to Boards.

4. COVENANTS DURING ENGAGEMENT.  While engaged by Boards, Consultant agrees that he will not, without the written consent of Boards:

(a) Make, draw, accept or endorse any contract, lease, or other instrument requiring the payment of money by Boards, except in the usual and regular course of business and exclusively on account, or for the benefit of, Boards pursuant to the terms of this Agreement;

(b) Make any statement or perform any act intended to advance an interest of any existing or prospective competitor of Boards in any way that will or may reasonably be thought to injure an interest of Boards in its relationships and dealings with existing or potential customers or solicit or encourage any other Consultant of Boards to do any act that is intended to be disloyal to Boards or

inconsistent with its best interest or in violation of any provision of this Agreement;

(c) Compete in any manner directly or indirectly with the business of Boards.

5. NONDISCLOSURE. The Consultant shall not, at any time during the term of this Agreement or at any time thereafter, except as may be authorized by Boards in writing, disclose or make use of, directly or indirectly, Boards' Confidential Information for his own benefit, for the benefit of others engaged in the same business as Boards or for others who Consultant believes or should reasonably believe might or could enter into the same business as Boards. Consultant acknowledges the material adverse impact to Boards due to any breach by Consultant of these provisions, no matter how small, and that any such breach shall cause him to forfeit any unpaid amounts set forth in Paragraph 6 below.

6. COMPENSATION.

(a) Basic Compensation: Consultant shall receive as basic compensation ("**Basic Compensation**") for all services rendered by the Consultant hereunder, a monthly payment of $25,000 (twenty five thousand dollars), or $150,000 (one hundred fifty thousand dollars) total for the 6 (six) month term of this Agreement. Boards shall receive a discount equal to 10%, or $15,000 (fifteen thousand dollars) off of the total amount of Basic Compensation for prepaying the term of this Agreement.

(b) Mark Up on Services Performed by Others: In addition to the amounts paid to Consultant as Basic Compensation, Consultant shall also be entitled to mark up the services of others at an amount equal to 15% of the amounts billed by others. Payment for services performed by others shall be administrated by the Consultant, paid from Boards to the Consultant at cost plus 15% and then paid from the Consultant to the third party performing said services. Boards hereby acknowledges that services provided by others will require prepayment in full or, in the alternative, the payment of a retainer in advance. Consultant shall not be expected to advance monies on behalf of Boards.

7. TERMINATION. This Agreement shall terminate upon the termination of Consultant's engagement, but the terms of the paragraphs herein which contemplate acts, the restraint of acts, or payments after the termination or expiration hereof, and the representations and warranties made herein, shall survive the termination of this Consulting Agreement for any reason. Consultant's engagement hereunder shall be terminated upon the happening of any of the following events:

(a) the death of the Consultant;

(b) upon the expiration of the Term of this Consulting Agreement according to its term;

(c) upon the malfeasance of Consultant in carrying out the duties of Consultant's engagement with Boards, not cured within thirty (30) days written notice.

8. REFORMATION. If elements of the agreements set forth in the above paragraphs would otherwise be determined to be invalid or unenforceable by a court of competent jurisdiction, the parties intend and agree that such court shall exercise its discretion in reforming the elements of this Agreement to the end that Boards and Consultant shall be subject to a consulting agreement, a covenant not to compete, a nondisclosure covenant and related covenants as close as possible to the terms in the paragraphs above and which are enforceable by Boards or Consultant.

9. ESSENCE. Consultant agrees that the covenant and agreements contained herein are the essence of this Agreement and that such covenants and agreements are reasonable and necessary to protect and preserve the interests and properties of Boards and Consultant; that irreparable loss and damage will be suffered by Boards should Consultant breach any of such covenants and agreements; that each of such covenants and agreements is separate, distinct and severable, not only from the other of such covenants and agreements but also from the other and remaining provisions of this agreement; that the enforceability of any such covenant or agreement shall not affect the validity or enforceability of any other such covenants or agreements or provisions of this Agreement and that the covenants and agreement shall be fully enforceable irrespective of how long Consultant has been engaged by Boards.

10. REMEDIES.

(a) Consultant agrees and understands that Boards has acted in reliance on the provisions of this Agreement in engaging Consultant and would not continue to engage Consultant if Consultant did not execute this Agreement.

(b) Consultant agrees that in the event he shall breach any of the above covenants and agreements, damage to Boards shall be presumed in any legal action by Boards against Consultant for damages. Boards shall be entitled to collect actual damages caused by Consultant's breach of any of the covenants and agreements. In addition to the above remedy and other remedies available to it, Boards shall be entitled to both permanent and temporary injunctions, without the posting of a bond and without the need to prove irreparable harm, to prevent a breach or contemplated breach by Consultant of any of the above covenants or agreements. Consultant hereby waives any claims he might make that any competition by Consultant with Boards in derogation of this agreement: 1) would be justified in any manner and 2) would not cause irreparable harm to Boards or that the restrictions on competition hereunder would be an improper restraint of trade. Consultant acknowledges that he is fully capable of earning a living upon termination of his engagement with Boards, without competing in any manner with the business of Boards.

11. MISCELLANEOUS.

(a) Binding Agreement: All the forms, covenants, representations, warranties and conditions of this Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective successors, heirs at law, legatees,

distributees, executors, administrators and other legal representatives.

(b) Waiver: No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition for the future or as to any act other than that specifically waived.

(c) Severability: If, for any reason, any provision of this Agreement held invalid, such invalidity shall not affect any other provision of this Agreement not held to be invalid, and each such other provision shall to the full extent consistent with law continue in full force and effect.

(d) Governing Law. The construction, interpretation, validity and performance of this Agreement shall be governed by the laws of the State of Oregon. The parties agree that venue for any action shall be in Washington County, Oregon.

(e) Entire Agreement. This instrument contains the entire agreement between the parties hereto with respect to the subject matter hereof and no prior or collateral promises or conditions in connection with or with respect to the subject matter hereof not incorporated herein shall be binding upon the parties hereto.

(f) Modification. No modification, extension, renewal, rescission, termination or waiver of any of the provisions contained herein or any future representation, promise or condition in connection with the subject matter hereof, shall be binding upon any of the parties unless made in writing and duly executed by the parties or their authorized representative.

(g) Headings. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this document.

(h) Attorney's Fees and Expenses. Boards and Consultant agree that, if either party has to employ an attorney to enforce this Agreement, the non-prevailing party shall pay reasonable costs, expenses, attorney's fees and paralegal fees through and including any appeals, settlement or negotiations required to enforce this Agreement incurred by the prevailing party.

(i) Material Inducement. Boards and Consultant agree and understand that both parties hereto have acted in reliance on this Agreement in executing this Agreement and the covenants contained herein are a material inducement for both parties hereto to do so.

(j) Survival. The terms of the paragraphs herein that contemplate acts, the restraint of acts, or payments after the termination or expiration hereof and the representations and warranties made herein shall survive the termination of this Agreement or Consultant's

engagement hereunder for any reason.

**IN WITNESS WHEREOF**, this Agreement is approved, signed, and becomes effective all as of the day and year first above written.

**BOARDS AIRCRAFT, LLC**

_____
By:   Greg Clausson
Its:   Manager

**DB517, LLC**

_____
By:   Darren Berg
Its:   Manager

# ATTACHMENT D

# CORPORATE AVIATION
## CONSULTING AGREEMENT

THIS CORPORATE AVIATION CONSULTING AGREEMENT (hereinafter referred to as the "**Agreement**") made the 1st day of August 2010, between K6 Aircraft Leasing, LLC (hereinafter referred to as "**K6**") and DB517, LLC (hereinafter referred to as the "**Consultant**").

## WITNESSETH:

WHEREAS, K6 desires to engage the services of the Consultant in the capacity hereinafter stated, and the Consultant is desirous of serving K6 in such capacity for the period of time noted herein and on the terms and conditions as set forth herein; and

WHEREAS, the services of the Consultant are unique, extraordinary and not readily replaceable due to his particular expertise and knowledge in himself previously owning and operating a multiple aircraft corporate flight department;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereto do hereby agree as follows:

1.  SERVICES AND DUTIES.

    (a) K6 hereby engages the Consultant to provide the services set forth in Paragraph 1 (b) below (the "**Consulting Services**") to K6 and the Consultant accepts such engagement and agrees to provide K6 the rendition of the Consulting Services, faithfully and to the best of his ability.

    (b) The Consultant shall produce and deliver a comprehensive report that studies and makes recommendations regarding the following aspects of the ownership and operation by K6 of its corporate jet aircraft: aircraft ownership structure, financing structure, registration structure (including coordinating a review by others of the taxation structure Oregon vs. Colorado), insurance structure (including coordinating a review by others of participation in an offshore insurance captive vs. "first dollar" conventional policies), fuel purchasing contracts (including coordinating a review by others of fuel hedging strategies), FAR Part 91 vs. FAR Part 135 operation (including coordinating the financial modeling by others of operations at varying annual hourly usage levels), FBO selection and negotiation of hangar space, charter certificate placement (if FAR Part 135 operations are deemed feasible), flight department staffing (including a review of current personnel and recommendations for staffing), safe operations (including coordinating a safety audit and coordinating the writing of flight department standard operating procedure manuals, all safety related items to be performed by an appropriately accredited and qualified safety consultant whose final report will be acceptable to current and future insurers

and lenders), aircraft maintenance (including coordinating a review of current maintenance procedures and coordinating the development of flight department standard operating procedures for maintenance, all maintenance related items to be performed by an appropriately accredited and qualified aircraft maintenance professional knowledgeable in the brand, make and model of aircraft operated by K6, said report(s) to be acceptable to current and future insurers and lenders), review airframe and engine maintenance (i.e. "power by the hour") contracts and recommend participation levels, and review dispatch and mission requirements (overlaying same against brand, make and model of aircraft available) and make recommendations for aircraft acquisition.

(c) Consultant shall further render such other services as may be reasonably requested of him by the President of K6.

2. TERM OF ENGAGEMENT.  The term of the Consultant's engagement hereunder shall become effective on August 1, 2010, and shall end on July 31, 2011. The engagement may be renewed upon similar terms by the mutual agreement of the parties.

3. CONFIDENTIAL INFORMATION.  All records of K6 which include, but are not limited to data processing reports, computer software and/or media containing its confidential information, travel patterns, strategic acquisition and growth plans, or any other materials or data of any kind furnished to Consultant by K6, acquired by Consultant while engaged by K6, or developed by Consultant on behalf of K6 or at its direction or for its use or otherwise in connection with Consultant's engagement hereunder, are and shall remain the sole and confidential property of K6. Consultant acknowledges that such information are the proprietary trade secrets of K6. All or any such materials and records shall hereinafter be known as **"Confidential Information."** If K6 requests the return of such Confidential Information at any time during, at, or after the termination of Consultant's engagement hereunder, Consultant shall immediately deliver the same and all copies or excerpts thereof to K6.

4. COVENANTS DURING ENGAGEMENT.  While engaged by K6, Consultant agrees that he will not, without the written consent of K6:

(a) Make, draw, accept or endorse any contract, lease, or other instrument requiring the payment of money by K6, except in the usual and regular course of business and exclusively on account, or for the benefit of, K6 pursuant to the terms of this Agreement;

(b) Make any statement or perform any act intended to advance an interest of any existing or prospective competitor of K6 in any way that will or may reasonably be thought to injure an interest of K6 in its relationships and dealings with existing or potential customers or solicit or encourage any other Consultant of K6 to do any act that is intended to be disloyal to K6 or inconsistent with its best interest or in violation of any provision of this Agreement;

(c) Compete in any manner directly or indirectly with the business of K6.

5. NONDISCLOSURE. The Consultant shall not, at any time during the term of this Agreement or at any time thereafter, except as may be authorized by K6 in writing, disclose or make use of, directly or indirectly, K6' Confidential Information for his own benefit, for the benefit of others engaged in the same business as K6 or for others who Consultant believes or should reasonably believe might or could enter into the same business as K6. Consultant acknowledges the material adverse impact to K6 due to any breach by Consultant of these provisions, no matter how small, and that any such breach shall cause him to forfeit any unpaid amounts set forth in Paragraph 6 below.

6. COMPENSATION.

(a) Basic Compensation:  Consultant shall receive as basic compensation ("**Basic Compensation**") for all services rendered by the Consultant hereunder, a monthly payment of $10,000 (ten thousand dollars), or $120,000 (one hundred twenty thousand dollars) total for the 12 (twelve) month term of this Agreement.  K6 shall receive a discount equal to 10%, or $12,000 (fifteen thousand dollars) off of the total amount of Basic Compensation for prepaying the term of this Agreement.

(b) Mark Up on Services Performed by Others: In addition to the amounts paid to Consultant as Basic Compensation, Consultant shall also be entitled to mark up the services of others at an amount equal to 15% of the amounts billed by others.  Payment for services performed by others shall be administrated by the Consultant, paid from K6 to the Consultant at cost plus 15% and then paid from the Consultant to the third party performing said services.  K6 hereby acknowledges that services provided by others will require prepayment in full or, in the alternative, the payment of a retainer in advance. Consultant shall not be expected to advance monies on behalf of K6.

7. TERMINATION.  This Agreement shall terminate upon the termination of Consultant's engagement, but the terms of the paragraphs herein which contemplate acts, the restraint of acts, or payments after the termination or expiration hereof, and the representations and warranties made herein, shall survive the termination of this Consulting Agreement for any reason. Consultant's engagement hereunder shall be terminated upon the happening of any of the following events:

(a) the death of the Consultant;

(b) upon the expiration of the Term of this Consulting Agreement according to its term;

(c) upon the malfeasance of Consultant in carrying out the duties of Consultant's engagement with K6, not cured within thirty (30) days written notice.

8.   REFORMATION. If elements of the agreements set forth in the above paragraphs would otherwise be determined to be invalid or unenforceable by a court of competent jurisdiction, the parties intend and agree that such court shall exercise its

discretion in reforming the elements of this Agreement to the end that K6 and Consultant shall be subject to a consulting agreement, a covenant not to compete, a nondisclosure covenant and related covenants as close as possible to the terms in the paragraphs above and which are enforceable by K6 or Consultant.

9. ESSENCE. Consultant agrees that the covenant and agreements contained herein are the essence of this Agreement and that such covenants and agreements are reasonable and necessary to protect and preserve the interests and properties of K6 and Consultant; that irreparable loss and damage will be suffered by K6 should Consultant breach any of such covenants and agreements; that each of such covenants and agreements is separate, distinct and severable, not only from the other of such covenants and agreements but also from the other and remaining provisions of this agreement; that the enforceability of any such covenant or agreement shall not affect the validity or enforceability of any other such covenants or agreements or provisions of this Agreement and that the covenants and agreement shall be fully enforceable irrespective of how long Consultant has been engaged by K6.

10. REMEDIES.

(a) Consultant agrees and understands that K6 has acted in reliance on the provisions of this Agreement in engaging Consultant and would not continue to engage Consultant if Consultant did not execute this Agreement.

(b) Consultant agrees that in the event he shall breach any of the above covenants and agreements, damage to K6 shall be presumed in any legal action by K6 against Consultant for damages. K6 shall be entitled to collect actual damages caused by Consultant's breach of any of the covenants and agreements. In addition to the above remedy and other remedies available to it, K6 shall be entitled to both permanent and temporary injunctions, without the posting of a bond and without the need to prove irreparable harm, to prevent a breach or contemplated breach by Consultant of any of the above covenants or agreements. Consultant hereby waives any claims he might make that any competition by Consultant with K6 in derogation of this agreement: 1) would be justified in any manner and 2) would not cause irreparable harm to K6 or that the restrictions on competition hereunder would be an improper restraint of trade. Consultant acknowledges that he is fully capable of earning a living upon termination of his engagement with K6, without competing in any manner with the business of K6.

11. MISCELLANEOUS.

(a) Binding Agreement: All the forms, covenants, representations, warranties and conditions of this Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto and their respective successors, heirs at law, legatees, distributees, executors, administrators and other legal representatives.

(b) Waiver: No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel against the enforcement of any provision of this

Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition for the future or as to any act other than that specifically waived.

(c) Severability: If, for any reason, any provision of this Agreement held invalid, such invalidity shall not affect any other provision of this Agreement not held to be invalid, and each such other provision shall to the full extent consistent with law continue in full force and effect.

(d) Governing Law. The construction, interpretation, validity and performance of this Agreement shall be governed by the laws of the State of California. The parties agree that venue for any action shall be in Riverside County, California.

(e) Entire Agreement. This instrument contains the entire agreement between the parties hereto with respect to the subject matter hereof and no prior or collateral promises or conditions in connection with or with respect to the subject matter hereof not incorporated herein shall be binding upon the parties hereto.

(f) Modification. No modification, extension, renewal, rescission, termination or waiver of any of the provisions contained herein or any future representation, promise or condition in connection with the subject matter hereof, shall be binding upon any of the parties unless made in writing and duly executed by the parties or their authorized representative.

(g) Headings. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this document.

(h) Attorney's Fees and Expenses. K6 and Consultant agree that, if either party has to employ an attorney to enforce this Agreement, the non-prevailing party shall pay reasonable costs, expenses, attorney's fees and paralegal fees through and including any appeals, settlement or negotiations required to enforce this Agreement incurred by the prevailing party.

(i) Material Inducement. K6 and Consultant agree and understand that both parties hereto have acted in reliance on this Agreement in executing this Agreement and the covenants contained herein are a material inducement for both parties hereto to do so.

(j) Survival. The terms of the paragraphs herein that contemplate acts, the restraint of acts, or payments after the termination or expiration hereof and the representations and warranties made herein shall survive the termination of this Agreement or Consultant's engagement hereunder for any reason.

**IN WITNESS WHEREOF**, this Agreement is approved, signed, and becomes effective all as of the day and year first above written.

**K6 AIRCRAFT LEASING, LLC**

By:  Ruth Kelly
Its:  Manager

**DB517, LLC**

By:  Darren Berg
Its:  Manager

# ATTACHMENT E

## ACCOUNT STATEMENT

METROPOLITAN BRANCH
1309 4TH AVENUE
SEATTLE WA 98101

PAGE   1 OF   1

FOR CUSTOMER SERVICE CALL 1.800.461.0810,
IN THE SEATTLE AREA CALL 206.461.0810.
TTY/TDD USERS: 1.800.232.6299.

ACCOUNT NUMBER
14260905
STATEMENT PERIOD
7-29-2010 TO   7-31-2010
C      1SK      O

MERIDIAN-GREENFIELD,LLC
701 5TH AVE SUITE 4050
SEATTLE WA 98104

www.bankofamerica.com
Our free Online Banking service allows you to check account balances, transfer funds,
pay bills and more.  Enroll now at www.bankofamerica.com.

### SUMMARY OF YOUR ACCOUNTS

| CHECKING | | SAVINGS | |
|---|---|---|---|
| FIRSTCHOICE BUSINESS | 14260905 | FIRSTCHOICE BUSINESS | 14260905 |
| BEGINNING BALANCE | .00 | BEGINNING BALANCE | .00 |
| DEPOSITS | 398773.57 | ENDING BALANCE | .00 |
| WITHDRAWALS | .00 | | |
| ENDING BALANCE | 398773.57 | AVERAGE DAILY BAL | .00 |
| TOTAL NUMBER OF CHECKS | O | | |

### FIRSTCHOICE BUSINESS CHECKING ACTIVITY

| POSTED | TRANSACTION DESCRIPTION/SERIAL NUMBER | DEBIT AMOUNT | CREDIT AMOUNT | REFERENCE # |
|---|---|---|---|---|
| 7-29 | DEPOSIT | | 398,773.57 | M 06644717 |

THANK YOU FOR BANKING WITH BANK OF AMERICA

BANK_AMERICA0000399

2010-Jul-30 12:16 PM Bank of America 2066761546                                    1/10

**Bank of America**    ☐ CA  ☐ ID  ☑ WA
**Business Signature Card**
**with Substitute Form W-9**

Account Number
**14260905**

Bank Number
**353**

Account Type:  ☑ DDA    ☐ SAV    ☐ CD

☐ Temporary Signature Card

Account Title
MERIDIAN-GREENFIELD,LLC

Legal Designation:  ☐ Individual/Sole Proprietor  ☐ Corporation  ☐ Partnership  ☐ Association  ☑ Limited Liability Company

Tax Identification Number:  460516081

By signing below, I/we acknowledge and agree that this account is and shall be governed by the terms and conditions set forth in the following documents, as amended from time to time: (1) if this account is a deposit account, the Deposit Agreement and Disclosures, the Business Schedule of Fees, and (2) if this account is a Line of Credit, the applicable Line of Credit Agreement and Disclosures. Furthermore, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with this account, and any Line of Credit checks which I/we may sign, and as the certification (set forth below) of the taxpayer identification number to which this was last reported. The Deposit Agreement includes a provision for alternative dispute resolution.

Substitute Form W-9. Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen or other U.S. person (defined in the instructions).

Certification Instructions: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. (See also IRS instructions for Form W-9.)

| The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. |

☐ Exempt (check if applicable)
☐ Nonresident Alien Status (if applicable). If all beneficial owners are considered Nonresident Aliens under the United States tax law, check here and complete and sign the applicable Form(s) W-8.

| | Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|---|
| 1 | DARREN BERG | MANAGING MEMBER | _Darren B. Manager_ | 7-29-2010 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

**ATM/Deposit Check Card Request:**
Provided that the account referenced above is eligible to receive automated teller machine cards and/or Check Cards, I (as authorized by the resolution and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

Signature _____  Title _____

**Bank Information**

**CUSTOMER 1**    Name DARREN BERG

| | | | | | |
|---|---|---|---|---|---|
| CIP Information: | ID Type: DL | ID#: BERG*D391KP | ID Issuer: WA | Issue Date: 5/19/2008 | Expiration Date: 03/77/13 |
| CIP Information: | ID Type: VISA | ID#: 1030 | ID Issuer: BOA | Issue Date: 00/00/00 | Expiration Date: 1/1/2013 |

**Customer 2**    Name _____

| | | | | | |
|---|---|---|---|---|---|
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |

**Customer 3**    Name _____

| | | | | | |
|---|---|---|---|---|---|
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |

**Customer 4**    Name _____

| | | | | | |
|---|---|---|---|---|---|
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |
| CIP Information: | ID Type: | ID#: | ID Issuer: | Issue Date: | Expiration Date: |

**Review Information**
Business Entity Inquiry:  072010CP1655 NR
If Sole Proprietor, General Partners or Associated/Unincorporated Group Members, complete the following:

| Name: | Year: | State: |
|---|---|---|
| Name: | Year: | State: |
| Name: | Year: | State: |
| Name: | Year: | State: |

| Date: 07/29/2010 | Banking Center Name & Cost Center: MERIDIAN/OLYMPIA 02911 |
|---|---|
| Associate Name: SANDY IKVONG | Associate Phone Number: 2066761544 |

90-53-2297NSBW 07-2009

2010-Jul-30 12:16 PM Bank of America 2066761546

 **Bank of America** Certified Copy of Limited Liability Company Resolutions Opening and Maintaining Deposit Accounts and Services

BANK OF AMERICA, N.A. (THE "BANK")



Bank Number  353

Account Number  14260905

Account Number

Name of Limited Liability Company  MERIDIAN-GREENFIELD, LLC

I, the undersigned, hereby certify to  BANK OF AMERICA , that I am a/the MANAGING MEMBER

Title  and the designated keeper of the records and minutes of

MERIDIAN-GREENFIELD, LLC , a ☒ limited liability company  ☐ professional limited liability company duly organized and existing under the laws of the State of  WA . (the "Company"); that I have full authority to manage, represent, sign for and bind the Company, that the following is a true copy of resolutions duly adopted by a majority of the members/managers of said Company at a meeting duly held on the 29 day of JULY , 2010 , at which a quorum was present and acted throughout or adopted by the written consent of a majority of the members/managers; and that such resolutions are in full force and effect and have not been amended or rescinded.

**1. Resolved,** that  BANK OF AMERICA  (the "Bank") is hereby designated as a depository of the Company and that deposit accounts and/or time deposits (CDs) to be opened and maintained in the name of the Company with the Bank in accordance with the terms of the Bank's Deposit Agreement and Disclosures and the applicable rules and regulations for such accounts; that any one of the following members, managers, or employees of this Company:

DARREN BERG                      MANAGING MEMBER
Name                                         Title/Status

_____            _____
Name                                         Title/Status

_____            _____
Name                                         Title/Status

_____            _____
Name                                         Title/Status

is hereby authorized, on behalf of this Company and its users, to execute and sign any application, deposit agreement, signature card and any other documentation required by Bank to open said accounts; to sign checks, drafts, notes, bills of exchange, acceptances, time deposits (CDs) or other orders for payment of money; to endorse checks, drafts, notes, bills, time deposits (CDs) or other instruments owned or held by this company for deposit with Bank or for collection or discount by Bank; to accept, drafts, acceptances, and other instruments payable at Bank; to place orders with Bank for the purchase and sale of foreign currencies on behalf of this Company; to execute and deliver an electronic fund transfers agreement and to make transfers or withdrawals by electronic transfer on behalf of the Company; to obtain an access device (including but not limited to a card, code, or other means of access to the Company's accounts) that may be used for the purpose of initiating electronic fund transfers [Company agrees and acknowledges that neither the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) nor Regulation E (12 C.F.R. Part 205) are applicable to any such access device]; to establish and maintain a night deposit relationship; to execute and deliver a wire transfer agreement and to request, or to appoint and delegate from time to time such persons who may request, wires of funds; to enter into any agreements with the Bank for the provision by Bank of various Treasury Management services to this Company as such member, manager or employee may determine, in his or her sole discretion, and to sign any and all documents and take all actions required by Bank relative to such Treasury Management services or the performance of the Company's obligations thereunder, and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in accordance with the terms of any such agreement shall have been received by Bank and that such termination shall not effect any action taken by the Bank prior to such termination; to rent or lease a safe deposit box from Bank, to execute the rental agreement or lease, to enter the safe deposit box and to terminate the rental agreement or lease; to take whatever other actions or enter into whatever other agreements relating to the accounts or investment of funds in such accounts with Bank and to execute, amend, supplement and deliver to Bank such agreements on behalf of the Company upon such terms and conditions as such member, manager or employee may deem appropriate and to appoint and delegate, from time to time, such person(s) who may be authorized to enter into such agreements and take any other actions pursuant to such agreements in connection with said accounts; that the member, manager or employee deems necessary; and to waive presentment, demand, protest, and notice of protest or dishonor of any checks, note, bill, draft, or other instrument made, drawn or endorsed by this Company; and

**2. Further Resolved,** that the Bank be and is hereby authorized to honor, receive, certify, pay or exchange for money orders or other instruments all instruments signed in accordance with the foregoing resolutions even though such payment may create an overdraft or even though such instruments may be drawn or endorsed to the order of any member, manager or employee signing the same or tendered by such member, manager or employee or a third party for exchange or cashing, or in payment of the individual obligation of such member, manager or employee, or for deposit to such member's, manager's or employee's personal account and Bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolutions or the application or disposition of such instrument or the proceeds thereof; and, further, that the Bank is authorized to honor any instructions regarding withdrawals, orders for payment or transfer of funds whether oral, by telephone or electronic means if such withdrawal, orders or transfer are initiated by an above authorized member, manager or employee; and

BANK_AMERICA0000401

Case 2:10-cr-00234-DMY ...BRAT Document 3-5 Filed 10/2... 99 Page 5 of 7
Case 2:10-cr-00234-DMY Document 3-5 Filed 10/22/10 Page 99 of 65 Page ID #:75

2010-Jul-30 12:16 PM Bank of America 2066761546

4/10



Account Number    14260905                     Account Number

3. **Further Resolved**, that the Bank be and is hereby requested, authorized and directed to honor and to treat as authorized, checks, drafts or other orders for the payment of money drawn in this Company's name, including those payable to the individual order of any person whose name appears thereon as signer thereof, when bearing or purporting to bear the facsimile signature of an member, manager or employee authorized in the foregoing resolutions and the Bank shall be entitled to honor, to treat as authorized, and to charge this Company for such checks, drafts, or other orders regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such signature resembles the facsimile specimen duly certified to or filed with the Bank by a member/manager of this Company or if such facsimile signature resembles any facsimile signature previously affixed to any check, draft, or other order drawn in the Company's name, which check, draft, or other order was accepted and paid without timely objection by the Company, thereby ratifying the use of such facsimile signature; and the Company hereby indemnifies and holds the Bank harmless against any and all loss, cost, damage or expense suffered or incurred by the Bank arising out of or in any way related to the misuse or unlawful or unauthorized use by a person of such facsimile signature; and

4. **Further Resolved**, that endorsements for deposit may be evidenced by the name of the Company being written or stamped on the check or other instrument deposited, without designation of the party making the endorsement, and the Bank is authorized to supply any endorsement on any instrument tendered for deposit or collection; and

5. **Further Resolved**, that a duly authorized member/manager of this Company shall certify to the Bank names and signatures of persons authorized to act on behalf of this Company under the foregoing resolutions and shall from time to time hereafter, as changes in the identity of said members, managers and employees are made, immediately report, furnish and certify such changes to the Bank and shall submit to the Bank a new account signature card reflecting such change(s) in order to make such changes effective and the Bank shall be fully protected in relying on such certifications and shall be indemnified and saved harmless from any claims, demands, expenses, losses, or damages resulting from, or growing out of, honoring the signature of any member, manager or employee so certified, or refusing to honor any signature not so certified; and

6. **Further Resolved**, that the foregoing resolutions shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as the Bank is concerned until three (3) business days after the Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by said Bank prior thereto; and

7. **Further Resolved**, that all transactions by any member, manager or employee of this Company on its behalf and in its name with the Bank prior to the delivery to the Bank of a certified copy of the foregoing resolutions are, in all respects, hereby ratified, confirmed, approved and adopted; and

8. **Further Resolved**, that any member/manager be and hereby is, authorized and directed to certify these resolutions to the Bank and that the provisions hereof are in conformity with the Articles of Organization and Operating Agreement of this Company.

In Witness Whereof, and intending to bind the Company, I have hereunto subscribed my name as a member/manager of this Company, this    29   
day of    JULY   ,   2010   .

_____ , Manager
Member/Manager

Bank Information

Date:   07 / 29 / 2010   

Banking Center Name:   METROPOLITAN   

Associate's Name:   SANDRA HARDING   

Associate's Phone Number:   206 . 676 . 1534   

90-53-7303NSBW 05-2010                                                    Page 2 of 2

BANK_AMERICA0000402

| Amount: | $398,773.57 | | Sequence Number: | 650644717 |
| Account: | 14260905 | | Capture Date: | 07/29/2010 |
| Bank Number: | 12500002 | | Check Number: | 0 |

## DEPOSIT



19-9/1250 WA
208

**Bank of America**

Washington

002105143    14260905
07/29/10 BUS CKG DEP        $398,773.57

⑆125000024⑆ 14260 905⑈        68⑈0039877357⑈

| | | | | |
|---|---|---|---|---|
| Amount: | $398,773.57 | | Sequence Number: | 650644718 |
| Account: | 1900013 | | Capture Date: | 07/29/2010 |
| Bank Number: | 12500801 | | Check Number: | 170626 |

FDIC INSURED

**THE COMMERCE BANK**
OF WASHINGTON
601 Union Street, Suite 1600 Seattle, WA 98101

**CASHIER'S CHECK** July 29, 2010

170626

19-863
1250

$ ****398,773.57
VOID AFTER 90 DAYS

PAY TO THE ORDER OF   Meridian-Greenfield, LLC

Three Hundred Ninety Eight Thousand Seven Hundred Seventy Three and 57/100 Dollars

MEMO: Lake Union Escrow

⑆170626⑆ ⑈125008013⑈ 1900013⑆ ⑉00398773579⑊

BANK OF AMERICA NA SEA
122000614 E1157 96 P10
07/29/10
065064471B

# ATTACHMENT F

## GUIDELINE CALCULATIONS FOR FREDERICK DARREN BERG

**2B1.1  Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction, Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Obligations of the United States**

| | |
|---|---|
| Base Offense Level | 7 |
| Loss over $100,000,000.00, but less than $200,000,000.00 | 26 |
| More than 250 victims | 6 |
| Sophisticated Means | 2 |
| Abuse of Trust | 2 |
| Obstruction of Justice | 2 |
| Adjusted Offense Level | 45 |
| Acceptance of Responsibility | -3 |
| **Total** | **42** |

**Guideline Range = 360 - life**

# ATTACHMENT G

## SUMMARY OF TRANSACTIONS

07/29/2010     Commerce Bank Cashier's Check #170626 from Lake
               Union Escrow payable to Meridian-Greenfield LLC
               in the amount of $398,773.57 was deposited to
               Meridian-Greenfield LLC Bank of America (BOA)
               account #14260905. (Funds were distributed to
               multiple accounts in large wire transfers.
               Balance in Bank of America account as of August
               31, 2010 was $14.00)

08/02/2010     Wire in the amount of $225,000 received in TD
               Ameritrade account #757-132600 in the name of
               DB517, LLC from Meridian-Greenfield, LLC BOA
               account #14260905. (Balance in TD Ameritrade
               account as of August 31, 2010, was $220,996.49)

08/02/2010     Wire in the amount of $100,000 received in
               Pacific Western account #47005809 in the name of
               Darren Berg from Meridian-Greenfield, LLC BOA
               account #14260905.  (Funds were used to pay
               various expenses and the balance in the Pacific
               Western account as of 9/10/2010 was $2,305.08)

09/09/2010     Check #103 was drawn on TD Ameritrade checking
               account 7402636802 in the amount of $50,000
               payable to Darren Berg.  The endorsement on the
               check is "Credited to the account of within named
               payee(s) Union Bank, N.A."

9/17/2010      Wire in the amount of $145,000 received in Union
               Bank account #3220055425 in the name of F Darren
               Berg from TD Ameritrade account #757-132600 in
               the name of DB517, LLC

9/17/2010      Withdrawal of $116,030.00 from Union Bank account
               #3220055425 in the name of F Darren Berg.
               Disposition of funds unknown.  (Balance in Union
               Bank account as of September 22, 2010, was
               $78,957.26)